United States District Court
Southern District of Texas
**ENTERED**
August 21, 2019
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| William Thrower, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. H-18-2473 |
| § | |
| Nancy A. Berryhill, § | |
| *Acting Commissioner of the Social* § | |
| *Security Administration* § | |
| § | |
| Defendant. § | |

# MEMORANDUM AND RECOMMENDATION

Plaintiff, William Thrower appeals the Social Security Administration Commissioner's final decision denying his application for social security benefits. (D.E. 1.) This case was referred to the magistrate judge for findings and recommendation pursuant to 28 U.S.C. § 636(b)(1). Pending before the court is Plaintiff's Motion for Summary Judgment (D.E. 12) and Defendant's Cross-Motion for Summary Judgment. (D.E. 15.) Having carefully considered the motions, filings, and applicable law, the court recommends that the final decision of the Commissioner be **AFFIRMED** and this case be **DISMISSED** with prejudice.

## 1. Procedural Posture

Thrower applied for disability insurance benefits on June 3, 2015. He claimed to suffer from physical and mental impairments with an onset date of September 2,

2014. After his application was denied on an initial review and on reconsideration, Thrower requested a hearing.

The hearing was held on July 19, 2017. The ALJ issued a decision on September 26, 2017, finding Thrower not disabled. The Appeals Council denied Thrower's request for review on June 26, 2018. Thrower filed this complaint in federal court to appeal the ALJ's decision.

## 2. Legal Standards

### A. Five-Step Process

The Social Security Act provides disability insurance benefits to people who have contributed to the program and have a physical or mental disability. *See* 42 U.S.C. § 423. It defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." *See* 42 U.S.C. § 423(d)(1)(A).

The Commissioner uses a sequential, five-step approach to determine whether the claimant is disabled. The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). A finding that the claimant is disabled or not disabled at any point in the five-step review terminates the analysis. *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).

At step one, the ALJ must determine whether the claimant is involved in substantial gainful activity. 20 C.F.R. § 404.1520(b) (2017). A person who is working and engaging in substantial gainful activity is not disabled, regardless of the medical findings. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).

At step two, the ALJ determines whether any of the claimant's impairments is severe, irrespective of age, education, or work experience. 20 C.F.R. § 404.1520(c) (2017). An impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985). A person who does not have a severe impairment is not disabled. *Wren*, 925 F.2d at 125.

The ALJ next determines, at step three, if the claimant's severe impairments "meet[] or equal[] a listed impairment in appendix 1." 20 C.F.R. § 404.1520(d) (2017); *see* 20 C.F.R. Part 404, Subpart P, Appendix 1 (2017) (the "Listings"). If all the criteria of a Listing are met, the claimant is considered disabled. 20 C.F.R. § 404.1520(d) (2017).

Before reaching the final two steps, the ALJ must assess the claimant's residual functional capacity (RFC) "based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e) (2017). An RFC assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and

is based on all relevant evidence in the claimant's record." *Perez v. Barnhart*, 415 F.3d 457, 461–62 (5th Cir. 2005) (quoting 20 C.F.R. § 404.1545(a)(1)).

At step four, the RFC is used to determine whether the claimant can perform past relevant work. *Perez*, 415 F.3d at 462. If the claimant can perform their past work, the claimant is not disabled. 20 C.F.R. § 404.1520(f) (2017). If not, the ALJ proceeds to step five. 20 C.F.R. § 404.1520(g)(1) (2017).

At step five, the ALJ determines whether the claimant can perform any other work by considering the claimant's RFC and other factors, including age, education, and past work experience. *Perez*, 415 F.3d at 462. If the claimant can perform other work available in the national economy, the claimant is not disabled.

### B. Substantial Evidence Standard of Review

This court's "review of the ALJ's disability determination is 'highly deferential': [it] ask[s] only whether substantial evidence supports the decision and whether the correct legal standards were employed." *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018). "A decision is supported by substantial evidence if credible evidentiary choices or medical findings support the decision." *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Id.* The reviewing court is required to examine the record as a whole to determine whether substantial evidence supported the ALJ's decision. *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992).

In determining whether substantial evidence supports the ALJ's decision, the court "does not reweigh the evidence in the record, try the issues *de novo*, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton*, 209 F.3d at 452. "Conflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.*

### 3. ALJ's Decision and Administrative Records

#### A. Hearing

At Thrower's hearing, the ALJ heard testimony from Thrower, a medical expert, and a vocational expert.

Thrower's attorney argued at the hearing that Thrower had a history of deep vein thrombophlebitis (inflammation causing a blood clot), pulmonary emboli (blood clots in the lungs), recurrent joint pain, neuropathy (damage to the peripheral nerves), retinopathy (disease of the retina), central serous retinopathy (eye disorder affecting straight-ahead vision), nerve impingement, pain in the arms, hands legs, and feet, and limitation of range of motion of the cervical spine and the lumbar spine. (Tr. 71.) Thrower testified that he felt he could not work due to shortness of breath, joint pain and pain in the arms, legs, back, neck, and head, swelling in his legs, and trouble seeing out of his right eye. (Tr. 76–78, 86.) He testified that he would get headaches four to five times a month. (Tr. 85.) Any stress, he said, would cause him pain and make him go to sleep for hours. (Tr. 86.) He testified that his problems

began after his first deep vein thrombosis. (Tr. 92.) Thrower testified about his daily activities. He said that he would go grocery shopping and take the kids to school. (Tr. 83.) He sometimes would go to the mall, but his pain limited the distance he could walk. (Tr. 84.) He testified that he tried to avoid, but would sometimes make breakfast, do laundry with his children's assistance, load and unload the dishwasher, go up and down the stairs, and do some yard work. (Tr. 86–89.) He helped his children with their homework. (Tr. 103.) He would get at least eight, and usually ten to twelve, hours of sleep per night. (Tr. 104.) He would nap for thirty minutes to three hours about two to three times per day. (Tr. 102–04.)

He testified that neuropathy causes pain from his thigh down through his leg at least two to three times a week, lasting between half a day and a day and a half. (Tr. 99.) He testified that after twenty to thirty minutes of standing or sitting, his legs would swell, which he would treat by laying down and putting pillows under his legs for the rest of the day. (Tr. 93.) He stated that on some days he could walk a block, and otherwise would be able to walk less than half a block without stopping. (Tr. 94–95.)

Thrower testified that he could probably lift a fifty-pound box once and carry a twenty-five pound box five to six times over an eight-hour work day. (Tr. 80.) He later testified that he could not lift 20 pounds and could lift maybe 10 pounds occasionally. (Tr. 95–96.)

He testified that he was taking a medication for his joint pain but his doctor discontinued it because it was causing severe liver damage. (Tr. 96–97.) He would take Tylenol for the pain. (Tr. 97–98.)

The medical expert, Dr. Goldstein, testified that Thrower has occasional postural limitations. He could not use ladders, ropes, and scaffolds, could occasionally use ramps and stairs, and did not have any manipulative or balance limitations. (Tr. 109.) Dr. Goldstein testified that Thrower's visual impairments would fluctuate. (Tr. 109–10.) He testified that the record did not reflect that Thrower had conditions that could produce physical or mental fatigue. (Tr. 112–13.)

The ALJ asked the vocational expert, Rosalind Lloyd, what work could be done by a hypothetical individual limited to light work with the option to sit or stand at will throughout the day, with the ability to occasionally use ramps or stairs, never use ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, or crawl. (Tr. 115.) The hypothetical individual could not have strict production quotas on work or perform assembly line work. (Tr. 115.) He would need goal-oriented assignments without pace requirements that could be completed by the end of a given shift. (Tr. 115.) The hypothetical individual would not be able to perform work requiring binocular vision but still had depth perception. (Tr. 115–16.)

The vocational expert testified that such a person could not perform Thrower's prior work, but could perform light, unskilled jobs such as counter clerk, office helper, toll collector, parking lot cashier, gate guard, and office clerk. (Tr. 115, 120.)

**B. Analysis**

The ALJ issued his decision on September 26, 2017, finding Thrower was not disabled from September 2, 2014 to September 26, 2017. (Tr. 11.) The ALJ followed the correct legal rules, and his findings are supported by substantial evidence.

### i. *Step One*

At step one, the ALJ correctly found Thrower had not engaged in substantial gainful activity since the alleged onset date of September 2, 2014. (Tr. 12.)

### ii. *Step Two*

At step two, the ALJ found Thrower's retinopathy, chronic pulmonary embolism, neuropathy, and venous thrombosis of the lower extremity to be severe impairments. (Tr. 13.)

### iii. *Step Three*

At step three, the ALJ found that none of Thrower's impairments or combinations of impairments were medically equivalent to a Listing. (Tr. 13.) The ALJ relied primarily on the opinion of the state agency medical consultants at the initial and reconsideration levels of the administrative review process. (Tr. 13.) Those physicians appropriately considered Listing 4.11, describing "chronic venous

8

insufficiency." (Tr. 126, 137–38.) Additionally, during the hearing Dr. Goldstein testified that he considered and found Thrower not to meet Listings 2.02 or 2.03 (eye problems), 11.14 (for neuropathy), or 4.11 (for venous insufficiency). (Tr. 108.) This finding was supported by substantial evidence and was not in error.

*iv. RFC*

Before turning to the final two steps of the analysis, the ALJ determined that Thrower had the RFC to:

> [L]ift and carry 20 pounds occasionally and 10 pounds frequently. He can sit, stand, or walk 6 hours in an 8-hour workday with normal breaks. He requires a sit/stand option at will. He can occasionally balance, stoop, kneel, crouch, crawl, or climb ramps or stairs. He cannot climb ladders, ropes, or scaffolds. He has only single vision in one eye. He is limited to goal-oriented without required pace work, and he can only perform jobs that can be completed by the end of the shift. He cannot perform jobs with strict production quotas or assembly line work.

(Tr. 13.)

In reaching this finding, the ALJ considered Thrower's medical records from Dr. Padma Chimata, Dr. Branden Hsu at Memorial Hermann Katy Hospital, Dr. Marianna Karpinos at the Kelsey-Seybold Clinic, the Fulshear Family Medicine clinic, Woodlake MRI & Diagnostic Imaging, Dr. Thomas Speer at OakBend Medical Center Hospital, and Dr. David Burns. (Tr. 15–16.) He also considered the opinions of treating physicians Dr. David Burns and Dr. Heidi Schultz, as well as the administrative findings of fact made by the state agency medical consultants. (Tr.

16.) The ALJ also considered the medical expert's and Thower's hearing testimony. The ALJ appropriately considered the combined effects of all Thrower's impairments and symptoms in determining his residual functional capacity. (Tr. 15.)

Thrower testified that he could probably carry a twenty-five pound box five to six times over an eight-hour work day. (Tr. 80.) The ALJ noted that Thrower's physical examinations generally reflected normal functioning. (Tr. 15.) The court's independent review of the record reflects that Thrower's exams generally reflected normal functioning or unremarkable results. (Tr. 361, 459, 461–62, 499, 563–64, 568, 583, 589, 651, 700, 704–05, 768, 848, 851–52, 857.) The attending staff at Texas Oncology cleared Thrower for work in March 2015. (Tr. 467–68.)

The ALJ noted that in September 2015 Dr. Heidi Schultz wrote, "[n]otes: [s]ix months off of work," but the ALJ concluded that this recommendation was based solely on Thrower's subjective complaints of pain and was not consistent with the medical record. (Tr. 15) The court finds that this finding was supported by substantial evidence. (Tr. 650 (Dr. Schultz's notes); *see also, e.g.*, Tr. 661–62 (Dr. Burns's records indicating normal examination results around the same time).) Similarly, the ALJ considered Dr. Burns's note that the claimant has been disabled since 2014 but discounted that opinion, again, because it was based on Thrower's subjective complaints. (Tr. 15.)

The ALJ's RFC determination was supported by substantial evidence and was not in error.

### v. *Step Four*

At step four, the ALJ found Thrower had no past relevant work to which he could return. (Tr. 17.) At the hearing, the vocational expert compared Thrower's age, education, work experience, and RFC to the requirements for the occupations Thrower had before his claimed disability date. (Tr. 116.) Because Thrower's past work was classified as "heavy," and his RFC limits him to "light" work, he can no longer perform his past work. The court finds that the ALJ's determination at step four was supported by substantial evidence and was not in error.

### vi. *Step Five*

At step five, the ALJ found that there were jobs in significant numbers in the national economy that Thrower could perform, and therefore he was not disabled. (Tr. 17–18.) At the hearing, the vocational expert testified that an individual with Thrower's age, education, work experience, and RFC would be able to perform the requirements of light, unskilled occupations. (Tr. 114–17.) Specifically, Thrower could work as a counter clerk, office helper, toll collector, parking lot cashier, gate guard, or office clerk. (Tr. 115, 120.) The ALJ found that the vocational expert's testimony was consistent with the Dictionary of Occupational Titles and, relying on the vocational expert's testimony, concluded that Thrower could perform those jobs,

which exist in significant numbers in the national economy. (Tr. 18.) The ALJ is entitled to rely on the vocational expert's testimony. Thus, the ALJ's determination at step five was supported by substantial evidence and was not in error.

### 4. Thrower's Arguments

#### A. Discounted Medical Opinions

Thrower argues that the ALJ improperly substituted his own medical opinion for the medical opinions in the record. (D.E. 12 at 8.) Relatedly, Thrower argues that the ALJ erred by discounting the opinions of Dr. Burns, the state agency medical consultants, and the medical examiner who testified in Thrower's hearing. (D.E. 12 at 8, 9.) The ALJ accorded the opinions of Dr. Burns and Dr. Schultz very little weight because they were inconsistent with Thrower's treatment records. (Tr. 16.) The ALJ also accorded the opinions of the state agency medical consultants little weight, finding Thrower's RFC "more limited" than they found it to be. (Tr. 16.)

This court finds that the ALJ followed the correct legal rules in evaluating these opinions and that his credibility determinations are supported by substantial evidence.

##### i.  *Dr. Burns, treating physician*

Thrower argues that the ALJ failed to properly evaluate Dr. Burns's opinion. (D.E. 12 at 13.) Dr. Burns found Thrower could stand or sit for up to fifteen minutes at a time, would need to move around frequently, should never or rarely lift ten

pounds or more, and should rarely twist, stoop, bend, squat, or climb stairs or ladders. (Tr. 871–72.) In several places on his medical source statement, Dr. Burns wrote "disabled," or "unable to work," without explanation. (Tr. 870–73.) In spaces meant for Dr. Burns to list Thrower's symptoms and their severity, Dr. Burns wrote "see all notes." (Tr. 870.) The ALJ accorded Dr. Burns's medical opinion "very little weight." (Tr. 17.)

The ALJ determines how much weight to give a treating physician's medical opinions. *Newton*, 209 F.3d at 455. The ALJ will give the treating physician's opinion controlling weight if it is well supported by medically acceptable diagnostic techniques and not inconsistent with substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2) (2017); *Newton*, 209 F.3d at 455.

If the ALJ determines that the treating physician's opinions should not be given controlling weight, the ALJ decides how much weight, if any, to give to the opinions by considering the factors under 20 C.F.R. § 404.1527(c). Those factors are (1) the length and frequency of the treatment relationship, (2) the nature and extent of the relationship, (3) the supportability of the doctor's findings, (4) the consistency of the findings with the rest of the record, (5) the physician's level of specialization, and (6) any other relevant factors. 20 C.F.R. § 404.1527(c)(2)–(6) (2017). The ALJ need not expressly consider all Section 404.1527(c) factors in

deciding to discount a treating physician's opinion. *See, e.g.*, *Jones v. Astrue*, 821 F. Supp. 2d 842, 852 (N.D. Tex. 2011).

The court finds that the ALJ's credibility determination as to Dr. Burns was supported by substantial evidence. Dr. Burns did not have a lengthy or frequent documented treatment history with Thrower. The ALJ explained why Dr. Burns's opinion was not supported by the medical evidence of record or consistent with the record as a whole. The ALJ found Dr. Burns's opinion to consist of "merely conclusory statements." (Tr. 16.) He noted there were no treatment records for nearly nine months before Dr. Burns completed the medical source statement. (Tr. 16.)

To the extent the ALJ erred by not considering all of the Section 404.1527 factors, the court finds this error is harmless because the court's independent review of the record, taking into consideration the relevant factors, shows that the record supports the ALJ's determination. Explicit consideration of the factors would not change the ALJ's conclusion.

### ii. *Medical expert and state agency medical consultants*

The ALJ found that Thrower's RFC was more limited than indicated by both Dr. Goldstein, the medical expert at Thrower's hearing, and the medical source statements of the state agency medical consultants. (Tr. 14–16.)

Although the hearing transcript omits Dr. Goldstein's statement on Thrower's exertional limitations (Tr. 109), the ALJ's decision reflects that Dr. Goldstein

testified that Thrower was limited to light work and occasional postural activities, and did not show manipulative or balance issues. (Tr. 14.) The state agency medical consultants found that Thrower was limited to lifting or carrying fifty pounds occasionally and lifting or carrying twenty-five pounds frequently. They found Thrower could stand, walk, or sit for about six hours in an eight-hour work day, climb occasionally, and balance, stoop, kneel, crouch, or crawl without limitation. They found no manipulative or visual limitations. (Tr. 127–28, 138–39.)

In reviewing these opinions as statements from non-examining sources, the ALJ appropriately considered SSR 96-6p, which provides that the opinions of state agency medical consultants can be given weight only insofar as they are supported by evidence in the case record. (Tr. 16); *see also* SSR 96-6P (S.S.A. July 2, 1996). The ALJ found Thrower "more limited" than Dr. Goldstein or the state agency medical consultants stated. In doing so, he accorded Thrower's subjective complaints of pain more weight than did the non-examining sources. (Tr. 16.) Specifically, the ALJ found that Thrower could lift less weight and suffered visual limitations. (Tr. 16.) The court finds that the ALJ's determination that Thrower's RFC was more limited than found by these non-examining sources was supported by substantial evidence.

### iii. Substantial evidence supporting the RFC

Thrower argues that the ALJ discredited all the medical opinions in the record and thus erred by formulating the RFC without the benefit of any medical source statements. The court finds the RFC is supported by substantial evidence without any controlling medical source statement.

"[T]he determination of residual functional capacity is the sole responsibility of the ALJ." *Taylor v. Astrue*, 706 F.3d 600, 602–03 (5th Cir. 2012). Consequently, the ALJ has the authority to interpret the medical evidence. *Id.* As discussed above, based on independent review of the record, Thrower's medical records provided substantial evidence to support the RFC determination regardless of the ALJ's decision not to accord any medical source opinion controlling weight. *See supra* 3(B)(iv).

The absence of a medical source statement describing the types of work a claimant can perform does not necessarily make the record incomplete. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). In this case, there was extensive medical evidence regarding Thrower's physical condition and the ALJ performed a thorough analysis of those records. Again, Thrower's physical examinations generally found his condition to be normal. (Tr. 361, 459, 461–62, 499, 563–64, 568, 583, 589, 651, 700, 704–05, 768, 848, 851–52, 857.) Where Thrower's records showed degenerative or arthritic deterioration in his shoulders, lumbar spine, ankles, and feet

in June 2015, the examination also showed "no evidence of active sacroiliitis" (inflammation of certain joints causing pain in the lower back and legs). (Tr. 663.) Another examination a few months later found no evidence suggestive of myopathy (disease causing muscular weakness), peripheral neuropathy (disease of the nerves delivering signals from the brain to the rest of the body), neuromuscular junction disorder (disorders causing muscle weakness, movement issues, and other related symptoms), or nerve entrapment of the lower body (direct pressure on a nerve causing pain or numbness). (Tr. 666.)

The ALJ also considered the medical expert opinions from state agency reviewers, although he concluded that the medical evidence and hearing testimony supported a greater degree of physical limitation than that recognized by the state agency reviewers.

The ALJ's RFC was supported by substantial evidence and was not in error.

**B. Psychiatric Review Technique**

Thrower argues that the ALJ erred by failing to follow Social Security Administration regulations setting forth the technique used to evaluate mental impairments, called the "Psychiatric Review Technique Form." (D.E. 12 at 11–13.)

Under 20 C.F.R. section 404.1520a, when a person claims to be disabled due to mental impairments, the ALJ must follow a special review technique to assess severity by (1) determining whether the alleged mental impairments are medically

17

determinable and (2) rating the degree of functional limitation resulting from the alleged mental impairments. 20 C.F.R. § 404.1520a(b) (2017). To rate the degree of functional limitations resulting from mental impairments, for the purposes of the step-two severity determination, the ALJ is required to look at four broad functional areas: the ability to understand, remember, or apply information; to interact with others; to concentrate, persist, or maintain pace; and to adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(3) (2017).

The ALJ found that there was no evidence of a mental impairment in the record based on Dr. Goldstein's testimony. (Tr. 14.) Dr. Goldstein did not find any medically determinable mental impairments in the record. (Tr. 105–13.) That finding terminated the ALJ's analysis under Section 404.1520. Thus, it was not error for the ALJ to decline to consider the four functional areas required at step two of that analysis.

The ALJ considered some degree of mental fatigue in determining Thrower's RFC. The fact that the ALJ generously accorded Thrower further limitations than supported by the record does not constitute record evidence of a medically determinable mental impairment. *See Byrd v. Barnhart*, 58 F. App'x 595 (5th Cir. 2003) (citing *Fountain v. R.R. Ret. Bd.*, 88 F.3d 528, 532–33 (8th Cir. 1996) (holding that the ALJ's failure to complete a Section 404.1520a analysis is harmless error where evidence of mental impairment is insubstantial).

This claim of error is meritless.

**C. Step Five**

Thrower argues that the ALJ failed to carry his burden to establish the existence of work available in significant numbers in the national economy that Thrower could perform. (D.E. 12 at 13.)

Thrower argues that his RFC is not compatible with the descriptions of the positions under the Standard Occupational Classification System. (D.E. 12 at 14.) He submitted a post-hearing brief arguing that the jobs the vocational expert identified are now classified as requiring capacities beyond Thrower's RFC. In support of that argument, he cites such sources as O*Net and Job Browser Pro, or SkillTRAN, which are databases for categorizing work performed in the U.S. economy. (Tr. 313–18.)

Thrower does not dispute that the VE's testimony accords with the Dictionary of Occupational Titles, but instead argues that the DOT is obsolete and the ALJ should have relied on other sources like O*Net and the Standard Occupational Classification system instead. (D.E. 12 at 13–15.)

Thrower's challenge to the reliability of the DOT does not alter this court's conclusion that substantial evidence supports the ALJ's findings at step five. *See supra* part 3(B)(vi). The Commissioner's rules allow reliance on the DOT. The VE and the ALJ may rely on the DOT to determine the level of skill required of a

particular job. *See* SSR 00-4P (S.S.A. Dec. 4, 2000) ("[W]e rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy.").

The vocational expert testified in the hearing based on the DOT and other resources available to her. Importantly, her testimony was also based on her more than five years of experience assisting people with disabilities identify and obtain suitable work opportunities based on vocational assessments and market research. (Tr. 305–06.). In Thrower's hearing, Thrower's counsel did not dispute that the VE was qualified to testify. The ALJ's decision to rely on the VE's knowledge and experience was not error. The ALJ's decision at Step Five was supported by substantial evidence.

### 5. Conclusion

The court's review of the administrative record reveals that substantial evidence supports the ALJ's findings at each of the five sequential steps. Therefore, the ALJ's decision denying Social Security benefits is supported by substantial evidence and is consistent with the law. There is no genuine issue of material fact, and summary judgment is appropriate. Fed. R. Civ. P. 56(a), (c). Accordingly, the court recommends that Defendant's cross-motion for summary judgment be **GRANTED**, and Plaintiff's motion for summary judgment be **DENIED**.

The parties have fourteen days from service of this Memorandum and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140, 147–49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).

Signed at Houston, Texas on *August 21*, 2019.

Peter Bray
United States Magistrate Judge